Oliver and Baum *v.* Pray.

---

\*WILLIAM OLIVER AND MARTIN BAUM *v.* JOHN PRAY. [175

Where an appeal bond is defective, occasioned by the act of the clerk taking it, and the Supreme Court, for that reason, quash the appeal, upon showing probable ground that the appellant had a case at law, equity will interfere and grant a new trial. In such case, the case may be retained, and tried in the Supreme Court.

THIS cause was adjourned here for decision from the county of Wood. It was a suit in chancery, in which the original and amended bill set forth, that in August, 1827, Pray sued out process in Wood county against complainants, which was served on Oliver only. The declaration set forth a special contract made between complainants, by their *attorney in fact*, Peter G. Oliver, and Pray, whereby it was alleged that complainants sold to Pray, on June 30, 1819, tract No. 35, and eighty acres of No. 29 (particularly described in the declaration); that Pray paid at the time six hundred and thirty-one dollars and sixty-one cents, and the balance, one thousand eight hundred and ninety-four dollars and

eighty-three cents, was to be paid in three equal annual payments, with interest. Deed was to be made on payment, etc. That Pray had paid in full, but complainants refused to convey, and had permitted the lands to be forfeited to the United States. The declaration also contains general counts for lands sold to which title had failed; also for money had and received. General issue pleaded by Oliver, and at May term, 1828, verdict and judgment against him for three thousand two hundred and twenty-six dollars and ninety-six cents. Due notice of appeal was given. Oliver not being present at the trial was informed of the judgment, and immediately went to Wood county to effect an appeal. The clerk at his request, prepared an appeal bond, which was drawn up by the clerk, or under his direction, and after having been executed by Oliver and his security, was accepted and approved by the clerk. That Oliver verily believed that said appeal bond was good and sufficient, and that said case was thereby duly appealed to the Supreme Court. That at the time Oliver applied to the clerk for an appeal bond the *costs* of the common pleas had not been taxed, and a blank, as usual, was left in the judgment for their insertion when taxed. That the clerk, by accident or mistake, omitted to insert the amount of costs in the appeal bond. That at the next term of the Supreme Court in Wood county the appeal was 176] quashed, upon motion *of Pray, upon the sole ground that the costs were omitted in the appeal bond, and thereupon execution was immediately issued upon the judgment.

The bill further alleges that the verdict and judgment are altogether unjust; that complainants, nor either of them, are indebted, legally or equitably, one cent to Pray; that no such contract as set forth in the declaration was ever made or confirmed by complainants, nor was Peter G. Oliver ever authorized to make any such contract, nor did complainants ever receive one cent from Pray for, or on account of the lands. Also, that the verdict was procured by the fraud, management, and contrivance of Pray, his agents and abettors.

That complainants have a just and equitable defense in the suit at law, which is set out as follows :

In the summer of 1817, complainants and others formed an association to purchase lands at the public sales in Wooster, and in July of that year, among others, purchased the lands in controversy and made the first payment therefor. Oliver was consti-

tuted the agent of the company, purchased the lands, laid off the lots, held the certificate as trustee, transacted all the business, and was the only one of the company who was intimately acquainted with the *locality*, relative *value*, and *situation* of the lands. In the summer of 1818, Oliver was made cashier of the Miami Exporting Company, in Cincinnati, and settled and closed all his accounts with the company, and transferred all certificates, etc., to Martin Baum, who was constituted trustee in his stead. In the summer of 1818, more than a year before the date of Perry's contract, Oliver sold out half his interest in the company to William Steele, and in the month of March, 1819 (also before the date of Pray's contract), Oliver sold out all his remaining interest to Jesse Embree & Co., since which time Oliver has had no interest directly or indirectly in the concern.

Early in 1818, Peter G. Oliver, brother of complainant Oliver, young and inexperienced, and having been somewhat unfortunate, applied to complainant Oliver to give him assistance. After some negotiations an arrangement was made, by which Peter G. took a tavern house of the company's, in the town of Maumee, and, for the rent thereof, was to collect rents for the company, protect the lands from waste, superintend *improvements, etc.; but had [177 no authority whatever, written or verbal, to sell the lands of the company, and never sold or pretended to sell any of the lands of the company except those now in controversy.

Complainant Oliver had lands of his own in the same vicinity, of which Peter G. also took charge; and, after complainant Oliver had sold out all his interest in the company, he, being well acquainted with the affairs of the company, and desirous to promote the welfare of his brother, Peter G., was often made the channel of communication between Peter G. and Baum, the trustee. That, in this way, and in his correspondence with his brother, Peter G., the wishes of Baum, the trustee, were often communicated by complainant Oliver to Peter G.

Early in 1819, Pray applied to Peter G., to purchase the lands in controversy. Peter G. told him he was not authorized to sell, but would write to the company. He did so, and received for answer that the company would not sell. Pray, having some object of speculation in view, revived his application to Peter G., and by crafty representation induced Peter G. to enter into a contract for the sale of the lands, knowing Peter G. had no authority,

but relying on the friendship of complainant Oliver, for his brother, to relieve him from the difficulties in which Peter G. would become involved by entering into the contract. Accordingly, Peter G., without any authority whatever, either written or verbal, and without the knowledge of complainants or any of the company, executed a contract of sale to Pray under seal, dated June 30, 1819, as agent for Martin Baum—the larger tract at fourteen dollars per acre, and the smaller at two dollars per acre; one-fourth in hand, the residue in three annual payments: one-half in cash; the other half in beef, pork, etc., at market price. Deed to be made when patent was obtained. This contract was not made known to complainants or any of the company, but Peter G., on August 23, 1819, twenty-three days after the contract was made with Pray, wrote to the company the prices above mentioned, which had been offered, not stating other particulars, to which complainant Oliver, by direction of Baum, the trustee, replied September 16, 1816, that the lands could be had on the following terms: No. 35, at fourteen dollars per acre, *the whole of 29 at three dollars per acre. The purchaser to pay government, and the company to be paid in advance, annually, the first in erecting a kitchen, the balance in one and two years, with a lien on the property when the certificates are transferred. After this letter, nothing more was heard in relation to the lands by complainants, or either of them, or any of the company, and it was supposed to have been abandoned, and was forgotten.

In September, 1821, owing to the pressure of the times, the company was unable to clear all their lands out of the office, and, at that time, took the benefit of the act of Congress, for consolidating, in which they relinquished to the United States the two tracts in question, still ignorant of Pray's pretended claim.

Complainant Oliver had some lands of his own to consolidate, and while making his arrangements, Peter G. communicated his earnest desire that complainant Oliver should consolidate on No. 35, without stating any particular reason, but suggesting that it would benefit him, Peter G., in relation to some mill improvements. Shortly afterward, Peter G. informed complainant Oliver, that it was No. 36, instead of No. 35, which he wanted, and complainant Oliver, accordingly consolidated on 36, still ignorant of Pray's pretended claim on 35. It afterward appeared that 35 was the lot intended by Peter G., and that his object was to comply

with the contract made with Pray, but the complainant Oliver knew nothing of his object or of the contract.

The first information complainants, or any of the company, had of Pray's contract or claim, was in the spring of 1822, long after the lands had been forfeited. Complainant Oliver then advised Peter G. to prepare himself and bid in the land at the resales, and offered to assist him if in his power; but this was done out of friendship only, and to relieve his brother from the unpleasant situation in which he was placed. Nor did Pray pretend that he had any claim on complainant Oliver, or any of the company; but, on the contrary, stated to complainant Oliver, that he had made arrangements with Peter G. to bid in the land at the resales.

About the date of Pray's contract with Peter G. for the land, Pray, by crafty representations, induced Peter G. to join him in erecting a mill, in whole, or in part, on 35, and so *man- [179 aged that a great part of the three first installments were converted into the mill, and no part of the purchase money ever was paid or come to the use of the complainants, or either of them, or any of the company.

Complainants charge that no part of the last installment has been paid. That Pray, on February 25, 1822, before the last installment was due, and after the lands were relinquished, persuaded Peter G. to accept of his promissory note or notes, for that installment, and indorse a receipt of payment in full on the contract, as of a date *prior* to the time it fell due, which was done by Peter. Suit was brought by Peter G., or his assignee, on some or all of these notes, and Pray set up, as a defense, that the consideration had failed, that Peter G. had no authority to sell, etc., and on these grounds, succeeded in his defense. Still the judgment includes the last installment, or a great part thereof. The indorsement on the contract was unknown to the complainants till after the trial of the cause at law.

In July, 1827, the lands were resold at Delaware. Pray and complainants were present—Peter G. was insolvent, and had removed to Huntsville, Alabama. At the resales, Pray did not pretend that complainants, or either of them, were under any obligation to purchase in the lands for his benefit, nor did he pretend that they, or either of them, were liable, in any way, to him, but, on the contrary, complained only of the hardship of his case, if any person should bid against him, and complainant, knowing

that Peter G. had acted improperly, and being unwilling that any man should suffer on his account, endeavored to prevent competition against Pray. This was done at the request of Pray, and in consequence of his urgent entreaty, and not because he was under any legal, equitable, or moral obligation so to do. Pray purchased in the lands, at one dollar and twenty-seven cents per acre.

The bill prayed a new trial of the action at law. It also prayed a perpetual injunction, and final settlement of the case, in chancery.

Two of the facts charged in the bill were admitted in the answer: the existence of the association of *Martin Baum* and others, as a land company; and that, in April, 1819, Peter G. Oliver informed Pray he was not authorized to contract *for the sale of the company's lands. All the other allegations were denied, either directly or evasively.

The testimony taken in the cause presented strong probable grounds in support of the defense against the action at law, which the complainants set up in their bill. Several points were embraced in the argument, which the court deemed it unnecessary to decide. The report is confined to the subjects decided by the court.

WILCOX, for complainants:

The first question is, has a court of equity jurisdiction over the case made in the bill.

1. It is too late for the defendant to raise this question. "After answering and putting the merits in issue, the court will go on and decide as the equity of the case may require." 1 Ohio, 126; Gilb. Ch. 219.

2. Suppose the question to be open, and that the case stood on demurrer. The general rule, as contended for by the defendant, is admitted: that where a trial has been had at law, and a good defense might have been made at law, equity will not interfere, either for the purpose of granting a new trial, or for general relief.

A short examination into the origin and reason of this principle will show that it can not apply to this case.

In England, courts of law had not the power of granting new trials until comparatively a recent period, or if they had the power, refused to exercise it. The first reported case of a new trial, granted at law, is in 1655: "Indeed, for a good while after

Oliver and Baum *v.* Pray.

this time, the granting of new trials was holden to a degree of strictness so intolerable that it drove the parties into a court of equity." 1 Seld. Prac. 483, 484, and cases cited.

After the memorable contest between courts of law and equity in England, it is well known that almost all the important business of the kingdom was brought before the chancellor. The courts of law were compelled, in self-defense, to relax the rigor of their practice, and to adopt a system suited to the necessities of the times, and founded upon liberal principles. It was then, for the first time, that in ejectment the term might be recovered at law, without the interference *of equity, and at the same time [181 the rule for granting new trials was established, which has ever since been adhered to in Great Britain and the United States, to-wit: "doing justice to the party," or, in other words, "attaining the justice of the case." The Queen *v.* The Corporation of Helston, 12 Ann, B. R.; 1 Seld. 483, 484, and references.

After the adoption of this rule, the chancellor, satisfied that the power of granting new trials could be exercised at a much less expense of time and money, by the court of law who tried the cause, declined his jurisdiction, which, in the process of time, has ripened into the principle contended for by the defendant, and admitted by the complainants.

Now the court will remark that the accident, or mistake, of which we complain, took place after the term when the trial at law was had, and, of course, after the power of the court who tried the cause had terminated. If the accident had occurred during the term, and the party had neglected to apply to the court for a new trial, equity would probably refuse to interpose; but, in this case, a party presents himself, whose complaint the court who tried the case, had not the power to listen to, or relieve, and who is without remedy, unless it can be obtained in a court of equity.

We are, then, thrown back upon the ancient practice of the court of chancery in granting new trials. We stand before this court, sitting as a court of chancery, in precisely the same situation as we should have stood before the chancellor of Great Britain, when the courts of law, in that country, had not the power of granting new trials. It is evident that the court, who tried this cause at law, had not the power to grant us a new trial; and it is also manifest, that formerly, in England, courts of law had not the power to grant new trials. If, then, the principles of equity, which are

167

universal in their operation, would have afforded relief in the one country, they must in the other.

No case, precisely in point with the present, can be found in England, or in any of the United States, except the State of Ohio, for the obvious reason that in no other system of jurisprudence are two jury trials permitted, one in an inferior court, and another in a superior court of record.

But the general principles of equity are sufficient for our pur-182] pose. Accident and mistake are two peculiar provinces *of a court of equity, and it will be difficult to find any case where relief has been refused, if the accident or mistake be clearly proved. The doctrine upon this subject is collected and recognized in 8 Wheaton, 174, a case, if possible, stronger than the present. 1 Washington, 254, is also a strong case, and much in point. There, the court relieved against a mistake committed by the clerk, although the party had an opportunity, during the term, to apply to the court for relief, on motion.

This subject was presented to this court, in the case of Waddle & McCoy *v.* Bank of the United States, 2 Ohio, 336, where the principal authorities are cited. In that case the judges were equally divided. It seems that the two judges, who were opposed to granting relief, went upon the ground, that if Waddle and McCoy had used reasonable diligence, they would have discovered the prior lien, and could have taken advantage of it on the trial at law. The present case steers entirely clear of this objection. The cause of our complaint did not exist at the time of the trial, nor, indeed, until after the term had expired. No possible diligence could have corrected our mistake, and no tribunal has ever had the power to hear our complaint, except that before which we now appear.

The precise question raised in this case was decided by Judge Swan, in the case of Sells *v.* Noble & Sells, Franklin common pleas, and which will be fresh in his recollection.

The same decision was also made by Judges Burnet and Hitchcock, in Chadwick *v.* Miller, Lawrence county, the record of which is herewith furnished.

These decisions, fortified by every principle of equity and common honesty, can not, and ought not, to be overturned.

HAMMOND submitted an argument on the same side, which is omitted.

EWING, for defendant:

The complainants seek : 1. A new trial  2. A perpetual injunc-
tion.  On the part of the defendant, we insist that they are enti-
tled to neither of these remedies.

1. Though the special prayer is for a new trial, there is another
species of relief, similar in its nature, which may be \*claimed  [183
under the general prayer, which, as it is essential to the full inves-
tigation of the case, I will briefly examine.  Authorities are cited,
which show that a bond, or other instrument, ineffectual for the
purposes intended by the parties, will be corrected and set up in
equity.  So far as these cases bear, they point to another mode of
relief, namely, *that the bond shall be set up in equity, and the appeal
perfected*, thereby placing the parties where they would have stood,
had there been no defect in the penalty of the bond.  Though the
complainants approach nearer to entitling themselves to this, than
to any other form of relief, consequent on the bill; yet the au-
thorities, in their bearing and analogy, do not support them in this.

In Simpson *v.* Vaughan, 2 Atk. 33, a joint bond was drawn by
one of the obligors, under circumstances which induced the court
to believe that it was intended to be joint and several, and equity
made it so, in pursuance of the intent of the *parties.*  There are
numerous other cases of the same import, all resting on the same
ground, the *intent* of the *parties.*  The last and strongest of these
is that of Hunt *v.* Rousmanier, 8 Wheat. 174–217, in which the court
set up a power of attorney, as a specific lien, because it was the *in-
tent* of the *parties* that it should be so, and it was, by mistake, made
ineffectual.

The cases cited, arise out of transactions purely conventional,
agreements *inter partes ;* in which the *intent of the individuals con-
tracting* is, in equity, of the essence of the contract.  In these cases,
therefore, it would be unconscientious in either party to take ad-
vantage of any mistake in the formation of the instrument which
would make it speak a language, or favor an operation contrary to
that intent.  Equity will, therefore, interpose and restrain them
from taking such advantage.  But the case at bar is totally dif-
ferent.  This bond is not the result of a contract between the obligors
and obligee.  It is from the first an adversary proceeding.  The
defendant was not privy to the making of it, nor was it even ten-
dered for his acceptance.  Two distinct tribunals were placed by
the law between him and this instrument, which was filed by his

Oliver and Baum *v.* Pray.

adversary with the intent to bind him—the clerk, who must pro·
nounce on the sufficiency of the sureties, and the court, who judge
of the legality of the bond. If both decided in its favor, he was
184] compelled to accept it; if *either declared against it, he
was freed from its effects. This bond, then, was never delivered or
accepted. The defendant was not a party to it. It is not bad faith
in him to refuse it, when the law has declared it insufficient. A
court of equity, therefore, can not act upon his conscience, and
compel him to accept it for what it is not, and for what he never
agreed to receive it.

The relief asked (a new trial in the common pleas), on the
ground of the defective appeal, is liable to more decisive objections
than the mode of relief which is above discussed. *That* would place
the parties in *statu quo*. *This* gives to the complainant important
advantages, which he never could have had if his defense had been
regularly conducted. *That* would require the defendant to accept
of a defective bond. *This* would compel him to dispense entirely
with the legal surety. Not only this, but the defendant having
obtained his second trial, without *surety*, has afterward his right of
appeal, and his third trial, as a matter of course, for the same cause.
The injustice of this seems to me manifest. And, on the other hand,
there does not appear that strong equity, in this part of the com·
plainant's case, which would justify the court in overstepping the
accustomed bounds of chancery jurisdiction, in order to afford
them relief. Natural justice requires that a suitor should have one
opportunity to prefer his claim, or make his defense; and if he lose
it, wholly without his fault, equity will, if possible, interpose and
restore him to his rights. But a right to two trials for the same
matter is not so perfectly clear that we could claim it as a prin-
ciple of justice, independently of positive law. If, then, positive law
gives a second trial, on a condition which is not complied with
(even though no one be chargeable with negligence), will a court
of equity order a second trial, merely because the right to it once
existed and is now lost? The case, so far as we can approach it in
equity, is identical with those cases where no appeal is allowed, on
any terms, by law. It is clearly so, if the court of common pleas
be regarded as a serious tribunal for the trial of litigated rights,
and not a mere sporting ground, where suitors play at foils, in or·
der to prepare themselves for an actual contest in the superior court
185] *If this be a good ground for the interference of a court of
170

Oliver and Baum *v.* Pray.

equity, I would suggest another, which is equally so. A trial is had in the common pleas, and a judgment rendered against a defendant, which he takes to be unjust. He gives notice of appeal, and uses every effort in his power to procure bail, but fails. Is he not entitled to relief in equity? What single objection could be urged against him, which can not, with equal force, be directed against the complainants? Would it be sporting with the rights of the judgment creditor to give a new trial, solely on the ground of an inability to appeal? Is it not equally so, when the party has the ability, but fails to exert it? In either case, it would be doing nothing more than substituting a new trial, without bail, for an appeal with it, because the terms on which the latter could be obtained, were not complied with.

If the court sustain this bill, they open for improvement a new and fruitful field of chancery litigation. In appeals from justices of the peace to common pleas, frequent difficulties occur, for which the profession has, as yet, found no remedy. A defective recognizance is taken; a slip of paper is sent by the bail to the justice, instead of a personal appearance, or, where the party goes forward, on the tenth day, to appeal his cause, the justice is absent, and he can not get him and his docket together. In all these cases (and their name is legion), courts of equity will be applied to for relief; and they must take jurisdiction on the principles of this case. Nay, on stronger ground, for here has been a trial by jury, the right to which is holden inviolate—in those cases there is none.

I have treated the case thus far, as if no laches were imputable to the complainant, in failing to perfect his appeal; but such is not the case. It is his duty to execute the bond, and see to its sufficiency. It is a question which he ought not to trust to the decision of the clerk. He should have submitted it to his counsel, and if he omitted this caution, he ought to bear the consequences of his own neglect. The clerk is agent for both parties, for the single purpose of settling the sufficiency of the bail. In taking the bond, so far as he acts, he is the agent of the appellant, who is bound by his acts, and to whom he is responsible, precisely as in any other act done by him in the progress of a cause. Place it *on the ground of a clerical error, or omission; who ever [186 heard of a clerical error in the progress of a suit at law, laying the ground of relief in equity? I have found no case in which the acts or omissions of the party (applying), or of the officers of the court

of law, done by the request of the party applying, have been corrected or relieved against by a court of equity.

An appeal is allowed from the common pleas to the Supreme Court, in chancery. One of the parties in the cause, dissatisfied with the decree, attempts to take an appeal, as in this case, and fails. Would the court sustain a bill to open the cause, on this ground, and have it reheard? It might be necessary for the purposes of justice that they should. The parties may have been negligent in taking testimony, and did not prepare themselves for trial in the court below, and have no ground of relief on their new bill, except the failure to appeal. It would be a hard and rather singular case; but if this bill be sustained, that must also. In every state in the Union, appeals from one tribunal to another are matters of daily occurrence. Appeals are quashed from defects in the bond; but in no case has a court of equity interfered, in any way, to relieve against it. This fact carries with it a strong argument against the jurisdiction. But when we consider the extent to which the principle, if once adopted, must go, and the harsh and unequal nature of the only relief which the court can grant, it seems to me conclusive.

This being a new experiment, we can find no case in point against it; but there are some authorities closely analogous.

In Dodge *v.* Strong, 2 Johns. Ch. 228, the complainant sets forth a strong case of injustice, in a judgment obtained against him by default, in his absence, under circumstances of considerable hardship. An application was made to the court at law for a new trial, who granted a rule on condition that the complainant should pay into court, in four days, the amount of the verdict and costs. He paid in the amount of the verdict, but not the costs, the cost bill not being taxed; and, in consequence of this omission, lost his new trial at law, and thereupon filed his bill in chancery, for relief, which was denied him. Chancellor Kent says, "the object of 187] the bill was *to obtain a new trial at law. The defense of the plaintiffs, if any they have, was legal and available at law, and if this court could grant relief, it would be by requiring the present defendant to submit to a new trial. But it appears to me, after a very careful examination of the case, as disclosed by the bill and answer, that I can not retain the injunction, consistently with established doctrines of this court. The plaintiffs, by their own negligence, or that of their attorney, suffered an inquest to be taken against

them by default. They then applied to the Supreme Court for relief, which was granted on certain conditions, and those conditions were not fulfilled. Here was a second default, and this court can not now interfere." And again, in reference to the same facts, he adds, "it is impossible to expect the aid of this court, unless the failure to comply with the condition arose from the act of the opposite party, or some unavoidable necessity." In the case of Simpson *v.* Bateman, 1 Schoale & Lefroy, 201, we have the opinion of Lord Redesdale, on a case similar to the one at bar. A verdict was had, at law, against the complainant, which he considered unjust, and having failed in his application for a new trial, on account of a defective notice of the motion, he sought relief in equity. But the bill was dismissed, and Lord Redesdale said that he could not find any ground whatever, for a court of equity to interfere, because a party had not brought evidence, which was in his power, at law, or because he had neglected to apply, in time for a new trial. "There are cases," he adds, "cognizable in law and also in equity, and of which cognizance can not be effectually taken at law, and therefore equity does, sometimes, interfere. So, when a verdict has been obtained by fraud, or where a party has possessed himself, improperly, of something, by means of which he has an unconscientious advantage, at law, which equity will either put out of the way, or restrain him from using. But, without circumstances of that kind, I do not know that equity ever does interfere to grant a new trial of matters which have been already discussed in a court of law. A matter capable of being discussed there, and over which a court of law has full jurisdiction."

It seems to me, on the whole, that the complainant is no better entitled to the relief prayed than he would have *been, had [188 the law allowed no appeal from the common pleas to the Supreme Court. He had his trial in the court below precisely as he would have had; the verdict and judgment have been the same, just or unjust, that they would have been; and the party has been guilty of some laches, in not availing himself of the remedy the law afforded him. If, then, the complainants make out a case for a new trial, independently of all right of appeal, let them have it. If not, equity can not give it them.

POWELL also submitted an elaborate argument on the same side, which is omitted.

WILCOX, in reply:

It is alleged that the appellant must draw up the bond at his own hazard, that the appellee is no party, and that the clerk's duty consists, simply, in "approving the securities."

The clerk, as well by the statute as by universal practice, is bound to draw up the bond. The statute gives him a compensation for it; he acts as agent for both parties; the bond is made payable to the appellee; it is delivered to the clerk, and not to the appellee; the approval of the clerk is the approval of the appellee. Suppose that under the statute it was necessary actually to deliver the bond to the appellee instead of the clerk, and the appellee had approved and accepted the bond as a valid one, and it afterward turned out to be defective—the very cases cited by the defendant show that this court would relieve without hesitation. Where, then, is the difference between the cases. A delivery to the agent is a delivery to the principal. It is to all intents and purposes a contract, in the language of the counsel, "*inter partes.*" But it is not necessary for the complainant to go so far. It is sufficient for us, that a ministerial officer of the law, in the performance of his duty, has committed a mistake greatly to our prejudice, and that the opposite party is seeking to obtain an unconscionable advantage founded upon this mistake.

The counsel seems to entertain great doubts as to the mode in which this court will exercise its jurisdiction in awarding a new 189] trial. That, if a new trial is awarded in *the common pleas, there may be three more jury trials, and, in the meantime, the defendant will lose his security. This court will excercise a sound discretion upon the whole case. A trial may be directed in the Supreme Court, and this court may order the present judgment to stand as security, or the court may direct a trial in the common pleas, or the court may retain this case and award an issue out of chancery to try any facts that may be considered doubtful. The court may make such order as will secure the rights of all parties.

That one trial has been had, it seems to me, is of no consequense, so that this court are satisfied that justice was not done between the parties on that trial. The right of a trial by jury in the Supreme Court is a positive right, and, in nine important cases out of ten, a judgment passes by consent in the common pleas. Neither law, nor common practice, nor common honesty require

Oliver and Baum *v.* Pray.

that a party should use that diligence in preparing his case in the common pleas, as upon final trial in the Supreme Court. The case now before the court is a common instance. Parties reside at a distance, pay little attention to a trial in the common pleas, resting their hopes upon an impartial trial in the Supreme Court.

The counsel supposes a case where a party can not procure bail, and asks, what would the court do in such a case? When such a case arises, the question may perhaps be answered. But if the adverse party should, by a fraudulent combination, prevent an appeal, the question would be somewhat varied.

It is also said that if this bill be sustained, a class of cases from justices of the peace, where defective recognizances have been made, and whose "name is legion," will be forced upon this court. It is only necessary to remark that the statute points out the mode by which such defective recognizances may be remedied in the common pleas.

I will not take up the time of the court in examining the numerous cases cited by the defendants. There is this sound palpable distinction between the cases cited and the one before the court—here a mistake has occurred after the power of the court, who tried the cause, had terminated, *and the party has had no oppor- [190 tunity of correcting the mistake.

It is true that to rectify this mistake, and to do justice between the parties, require the exertion of the extraordinary powers of this court. But, if the court will be at the trouble to trace the history of this court from the time it first asserted jurisdiction over judgments at law, they will find these powers recognized, and occasionally, though not frequently, exercised. Extraordinary cases will sometimes arise in all civilized governments, and there is, of necessity, an extraordinary power vested somewhere to meet such cases. The court will find all the cases of this nature collected in a note, 3 S. C. Equity, 325, the result of which is, "that courts of equity will give relief in all cases (not of a criminal nature) of fraud, surprise, or extraordinary cases, where complete justice has not been done, and in many cases on principles of general policy."

Opinion of the court, by Judge SWAN:

The principal question is, whether a court of chancery has jurisdiction of the case, as made by the bill. The question, in this

respect, is important, and has received the full consideration of the court.

The statute of February 18, 1824, vol. xxiv. 72, allows an appeal to the Supreme Court, of course, from any judgment or decree rendered in the common pleas, in which such court had original jurisdiction; and the party desirous of appealing shall, at the term of the court of common pleas at which the judgment or decree was rendered, enter on the records of the court notice of such his intention, and within thirty days after the rising of the court shall enter into bond to the adverse party, with one or more good and sufficient securities, to be approved of by the clerk, in double the amount of the judgment or decree rendered, etc. The appeal bond, in this case, was taken in double the amount of the judgment, exclusive of costs.

On motion of the respondent, the Supreme Court quashed the appeal upon the grounds that the bond was not executed in conformity with the provisions of the statute. The amount of the **191]** penalty was supposed to be matter of positive *law, and one of the requisites upon which the appellate jurisdiction of the court depends. To effect an appeal, the provisions of the statute, no doubt, must be substantially complied with. It can not be done without the notice is entered of record, at the term in which the judgment or decree was rendered. So the appeal must fail, if the bond should not be executed within the time prescribed by the act, and it has been several times decided that the penalty of the bond must be in double the amount of the judgment or decree, including the costs.

The party has his right of appeal, upon complying with the conditions annexed by the statute. His right is lost, by omitting or neglecting to perform any of the conditions, and the appellate jurisdiction of this court altogether ceases over the cause. With regard to notice and filing the bond, within thirty days after the rising of the court, the decisions have been uniform, that the omission, in either case, ousts this court of its jurisdiction. It is undoubtedly within the powers of the legislature to attach all reasonable conditions to the right of appeal, and thus place a limitation upon the appellate jurisdiction of this court. The cause is not appealed without the party performs the conditions required by statute, and when he neglects to do so, to entertain jurisdiction would be mere usurpation of power. But the objection comes too

late, to the correctness of the decision, in dismissing the appeal. The party complaining of the injury is fixed with the judgment of the court of common pleas, and the common law can afford him no remedy. This is the case, whether the dismissal of the appeal was justified by a correct interpretation of the law or not. The injury, if any, to the complainants has originated with the clerk, who prepared the bond, or with the appellant who executed it. Uniform practice has fixed the drafting of these bonds upon the clerks. Their offices are usually furnished with blanks for the purpose.

The bill and evidence show conclusively, that the bond was, in good faith, prepared by the clerk, and in good faith executed by the principal obligor. By mere mistake, or misapprehension in both, the costs were not doubled with the judgment, and inserted as the penalty. Doubts as to the necessity of adding the costs, in the penalty of the bond, *have existed with the bar. Even [192 some of the judges have not been without them. This is a mistake, then, which a plain man, acting in perfect good faith, might naturally commit, upon the most careful examination of the law, and using every effort to comply with its provisions. No fault or negligence can be imputed to the party seeking to resist the plaintiff's claim in the appellate court. The record shows most satisfactorily, that Oliver honestly believed he had a meritorious defense to the action. In no part of the proceedings does it appear that he was using the court of common pleas merely to ascertain the strength of his adversary. The cause was submitted to the jury in his absence, and there are circumstances disclosed, by the evidence and exhibits, which show an effort, on the part of the present defendant, to prevent the appellant from obtaining security to the acceptance of the clerk, not very consistent with the idea that the judgment was fairly recovered and justly due. But, although this may cast a shade of suspicion over the fairness of the judgment, it does not lay the foundation of chancery jurisdiction. From the nature of society, it is difficult, if not impossible, to embrace the powers of a court of chancery in a general definition. Peculiar and extraordinary cases will arise, in the complex and diversified affairs of men, which perhaps can not be classed under any of the distinct heads of chancery jurisdiction, but which must be acknowledged, nevertheless, to come within the legitimate powers of the chancellor, because complete justice can not.

otherwise be done between the parties. Of this character is the case of Ray v. Duke of Beaufort, 3 Atk. 191. In that case Lord Hardwicke makes some remarks quite applicable to the case under consideration : " It frequently happens there may be a just cause of action, yet the real motives may be very unjust, which a court of equity will always take into consideration, though they can not, at law, pay any regard to it."

The following cases show that courts of equity go far to prevent injustice, when no remedy exists at law. Countess of Gainsborough v. Gifford, 2. P. Wms. 425 ; Hunt v. Rousmanier's Adm'r, 8 Wheat. 174. Further authorities are collected in a note to 3 Desaus. 325. This reference wants accuracy; but some of the 193] cases go far to justify the remark, *" that courts of equity will give relief in all cases, not of a criminal nature, of fraud, surprise, or extraordinary cases, when complete justice has not been done; and in many cases upon principles of general policy."

Anciently, courts of equity exercised jurisdiction in granting new trials in cases of manifest injustice, or when testimony had been newly discovered. The practice went out of use when courts of law became more liberal in granting new trials. 6 Johns. 479. Chancellor Kent says, " the present case seems to prove an exception to the modern rule, and to require of this court the exercise of that ancient jurisdiction, because here is a case in which the court of law has no power to award a new trial upon the merits." The case at bar is within the principle and reason of the one last cited. This defective statutory bond was executed after the term, when it was neither in the pewer of the party to apply for, nor of the court to grant a new trial. It is a case within the exception of the modern rule, and the court is therefore permitted, upon the justest principles, to resort to "its ancient jurisdiction." This court considers this as an extraordinary case, in which the injured party has no redress, if a court of equity has no jurisdiction. Great injustice may follow, especially to the complainant Oliver, should the judgment of the court of common pleas conclude the parties. From the peculiar circumstances of this case, and to prevent that injustice which may otherwise take place, this court believes no sound principle is violated by entertaining jurisdiction of this cause. But it is not enough that the court has jurisdiction of the subject matter. We must be satisfied that the complainants have some merits, some grounds of defense to the action at

law, before the judgment will be set aside. It is not enough that the party has lost the naked right of a second jury trial in the Supreme Court. A judgment never ought to be opened to gratify a spirit of litigation.

From the novelty of the circumstances of the case, and from the fishing grounds assumed in the bill, in order to catch an equity as well as the amount in controversy, a vast many exhibits, and a geeat body of testimony, are found with the record. The evidence in the cause shows most satisfactorily *that the complain- [194 ants have grounds of defense to the action at law.

It is not proper for this court to say what effect that evidence ought to have, or may have, upon an issue between the parties. Nor does it anywhere appear, nor was it necessary it should appear, that all the evidence is produced in this cause within the power of the parties. It is competent for the parties to produce other testimony in explanation of their rights and the merits of the cause. The complainants can not ask more of this court than to be restored to what they have lost, without their default. If the defendant had a just claim upon the complainants to the amount of his verdict and judgment, he has it still, and can prosecute it in the Supreme Court as well now as he could if the appeal bond had, in form, met the approbation of the court; if he had not, to enforce the judgment would be against all equity. As to accepting the bond, the mistake originated with the agent of the law as well as the appellant. The clerk was wholly ignorant of the law, or of the construction which had been put upon it, as to the penalty of the bond. We are not, however, prepared to say that a mere mistake in law of a party would give this court jurisdiction, although there are some cases which seem to go that far. 3 Wheat. 174; 2 P. Wms. 315. It seems to this court this would be laying down the principle too broadly. There must, in general, be other circumstances to authorize the interference of a court of equity. Perhaps it would be well to make the case, in addition to a mistake in point of law, one in which it would be against conscience for the other party to insist upon, or which, at once, would shock the moral sense, if enforced. This is that case, as the bill and evidence disclose it. The respondent has obtained an advantage by the misprision of the clerk, or the mistake of one of the complainants, which he is attempting to retain, when he must know that the appellant has acted, so far as it respects the

179

pursuit of his legal rights, with perfect good faith, and with all reasonable diligence. He must also know that the complainants, especially one of them, have some legal grounds of resisting his claims in a court of law. The law would be dishonored if courts were furnished with no powers to place the parties thus situated 195] in *statu quo*, and thus prevent probable injustice. There *is no principle to be found in the books which forbids a court of chancery from granting relief under such circumstances. Reason, justice, equity, require it.

This cause, upon the settled rule that when the court of chancery has gained jurisdiction of a cause for one purpose it may retain it generally, will remain in this court. This being the unanimous opinion of the court, it is therefore ordered, adjudged, and decreed that the action at law, the judgment in which is enjoined in this cause, be docketed in the Supreme Court in the county aforesaid; that the declaration be so amended as to make said Martin Baum a party thereto; that the said Martin cause his appearance to be entered in the said action, plead thereto the general issue, and that the cause stand at issue for trial, on the merits, at the next Supreme Court for said county. On the trial, no objection shall be taken for misjoinder or want of parties, further than this: If it should appear that the plaintiff has a good cause of action against Oliver, arising out of the transaction in litigation, but not against Baum or any other of the company in the pleadings named in these causes, then a verdict shall be taken against said Oliver, and not against said Baum; if it should appear on the trial that the plaintiff has cause of action, growing out of the transaction in litigation, against the said Baum alone or the said Baum and others, then the verdict shall be taken against the said Baum, and in favor of the said Oliver. In this trial no exceptions shall be taken to the depositions in this suit in chancery or the action enjoined, but they may be then read, unless there may be other legal objections taken and sustained.

This cause to stand continued for further proceedings, etc.